**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALIRIO ZAVALA, JUAN CARLOS DIAZ, ALEXANDER GONZALEZ, JAUME VILLAGRASA, LUIS TORRES, JOSE BRICENO, LUCIANO EMIGDIO, NICOLAS VELASQUEZ, GUSTAVO RANGEL, ARODIS HERRERA, JORGE GUERRERO, SEGUNDO MORALES MARTINEZ, SAHAGUN MEREJILDO, JAIME GRANADA, JOHN JAIME RIVERA ALAYON, ANDRES TORRES, ERNESTO ALEJANDRO SANCHEZ, and EDUARDO CRUZ GONZALEZ,

              Plaintiffs,

   v.

PEI ELECTRICAL SERVICES GROUP INC., CPI ELECTRICAL SERVICES INC., PABLO IBEPAULINO, and TOP SHELF ELECTRIC CORP., jointly and severally,

              Defendants.

Index No. 20-cv-9437 (PAE) (GWG)

---

**MEMORANDUM OF LAW IN SUPPORT OF TOP SHELF ELECTRIC CORP.'S MOTION FOR SUMMARY JUDGMENT**

---

**COLE SCHOTZ P.C.**
Brian L. Gardner
Jason R. Finkelstein
*Attorneys for Defendant, Top Shelf Electric Corp.*
1325 Avenue of the Americas
Suite 1900
New York, New York 10019
(212) 752-8000

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY ............................. 4

LEGAL ARGUMENT........................................................................................................... 14

     I.     SUMMARY JUDGMENT STANDARD OF LAW ............................................. 14

     II.    TOP SHELF IS NOT LIABLE FOR ANY OF PLAINTIFFS' CLAIMED
           DAMAGES AS THEIR ALLEGED EMPLOYER............................................. 15

          A.    Applicable Standards and Tests for Evaluating Alleged Employer-
               Employee Relationships........................................................................... 15

          B.    Top Shelf Was Not Plaintiffs' Employer as a Matter of Law.................. 17

               1.    Top Shelf Did Not Maintain "Formal Control" Over the
                     Plaintiffs ...................................................................................... 17

               2.    Top Shelf Likewise Did Not Possess Any "Functional
                     Control" Over Plaintiffs ............................................................. 23

CONCLUSION...................................................................................................................... 29

53827/0008-42381357v2

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Barfield v. New York City Health & Hospitals Corp.*,
  537 F.3d 132 (2d Cir. 2008)...................................................................................15

*Carter v. Dutchess Cmty. Coll.*,
  735 F.2d 8 (2d Cir. 1984).............................................................................. *passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...............................................................................................14

*Chen v. Street Beat Sportswear, Inc.*
  364 F. Supp. 2d 269 (E.D.N.Y. 2005) ...................................................................21

*Godlewska v. Human Dev. Ass'n, Inc.*,
  916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd* 561 Fed.Appx. 108 (2d Cir. 2014) ..............25, 27

*Herman v. RSR Sec. Servs. Ltd.*,
  172 F.3d 132 (2d Cir. 1999)...................................................................................15

*Hugee v. SJC Group, Inc.*,
  2013 WL 4399226 (S.D.N.Y. Aug. 14, 2013) .......................................................25

*Irizarry v. Catsimatidis*,
  722 F.3d 99 (2d Cir. 2013).....................................................................................16

*Jean-Louis v. Metro. Cable Communications, Inc.*,
  838 F. Supp. 2d 111 (S.D.N.Y. 2011)........................................................24, 25, 26

*Karpova v. Snow*,
  402 F. Supp. 2d 459 (S.D.N.Y. 2005)...............................................................14, 21

*Kwon v. Yun*,
  606 F. Supp. 2d 344 (S.D.N.Y. 2009)....................................................................14

*Martin v. Sprint United Mgmt. Co.*,
  273 F. Supp. 3d 404 (S.D.N.Y. 2017).............................................15, 16, 21, 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..........................................................................................14, 21

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947)...............................................................................................15

ii

*Spicer v. Pier Sixty LLC,*
   269 F.R.D. 321 (S.D.N.Y. 2010) .........................................................................................16

*Zheng v. Liberty Apparel Co. Inc.,*
   355 F.3d 61 (2d Cir. 2003).................................................................................. *passim*

**Statutes**

29 U.S.C. § 203(d) ...................................................................................................... 15-16

29 U.S.C. § 203(e) .............................................................................................................15

29 U.S.C. § 203(g) .......................................................................................................15, 17

NYLL § 190(3) ..................................................................................................................16

Fed. R. Civ. P. 56(a) .........................................................................................................14

Defendant, Top Shelf Electric Corp. ("Top Shelf"), respectfully submits this Memorandum of Law, along with the accompanying Declarations of Antimo Ponticello, dated January 21, 2022 (the "Ponticello Decl."), Cathy Askew, dated January 21, 2022 (the "Askew Decl."), and Jason R. Finkelstein, Esq. (the "Finkelstein Decl."), dated January 21, 2022, and the exhibits annexed thereto, in support of Top Shelf's motion for summary judgment and a dismissal of all claims asserted against Top Shelf in the Complaint filed in this action by Plaintiffs Alirio Zavala, Juan Carlos Diaz, Alexander Gonzalez, Jaume Villagrasa, Luis Torres, Jose Briceno, Luciano Emigdio, Nicolas Velasquez, Gustavo Rangel, Arodis Herrera, Jorge Guerrero, Segundo Morales Martinez, Sahagun Merejildo, Jaime Granada, John Jaime Rivera Alayon, Andres Torres, Ernesto Alejandro Sanchez, and Eduardo Cruz Gonzalez (collectively, "Plaintiffs") (the "Motion").

## PRELIMINARY STATEMENT

For more than a decade, Top Shelf has performed electrical subcontractor work on a wide variety of construction projects throughout the Tri-State area.  In the ordinary course of its business, and as is typical in the construction industry, Top Shelf often subcontracts out some of the work on its projects to smaller companies.  Two such projects are those that are the focal point of this litigation, one at 147-151 East 86th Street, New York, New York (the "86th Street Project"), and the other at the Halletts Point building located at 1-02 26th Avenue, Queens, New York (the "Halletts Point Project").  During an open subcontracting bidding process for both jobs in 2018, Top Shelf was approached by Defendant PEI Electrical Services Group Inc. ("PEI"), and its owner, Defendant Pablo Ibepaulino (and, collectively with Defendant CPI Electrical Services Inc., the "PEI Defendants") – parties that Top Shelf had never previously engaged as subcontractors, but which appeared reputable and made a competitive bid for certain roughing and finishing electrical work.

Once PEI was selected as one of Top Shelf's several subcontractors for the 86th Street Project and the Halletts Point Project, Top Shelf provided PEI with a schedule for completing various floors in the respective apartment buildings, and PEI would then invoice Top Shelf based upon predetermined "per unit" rates. As with any other Top Shelf subcontractor performing work on a "per unit" basis, it then became PEI's sole responsibility to complete the work – on time and correctly – regardless of how many laborers PEI employed or how many hours they each worked. While Top Shelf is responsible for staffing, scheduling and directing its own laborers, it has little to no knowledge or input into how its subcontractors – such as PEI – are doing so. And again as with any other Top Shelf subcontractor, including those at the 86th Street Project and the Halletts Point Project, the only limited oversight that Top Shelf would ever have over PEI was for quality control and safety purposes.

Several months into the subcontractor relationship with PEI and Mr. Ibepaulino, Top Shelf received complaints from several of the Plaintiffs that they were allegedly not being paid. This came as a surprise to Top Shelf, particularly since Top Shelf had paid all invoices submitted by the PEI Defendants for their work on the 86th Street Project and the Halletts Point Project. When this issue was not immediately rectified by Mr. Ibepaulino, Top Shelf promptly terminated the PEI Defendants and continued to complete the projects without them.

Against this backdrop, Plaintiffs assert a variety of unpaid wage claims in this litigation under the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL") and common law theories for alleged unpaid wages against Top Shelf and all of the PEI Defendants. For purposes of this Motion, Top Shelf does not dispute that Plaintiffs might not have received full payment for their labors at the 86th Street Project or the Halletts Point Project. However, while Top Shelf may be sympathetic to Plaintiffs' predicament, it does not make Top Shelf liable for

2

their alleged damages that are premised entirely upon their actual employer's failure to remit payment.  Holding Top Shelf liable as a direct or joint employer under the undisputed material facts of this case would quite literally stand the construction industry on its head, as it would make every subcontractor jointly and severally liable for *any* of its subcontractor's laborer's unpaid wage claims.  That result would also conflict with a well-established body of caselaw addressed herein that is designed to assess joint employer liability and expose sham subcontracting arrangements, not genuine, arms-length dealings like that between Top Shelf and PEI.  The factual record of this case cannot legitimately be disputed, and this Court therefore can, and respectfully should, determine that Top Shelf is not liable as Plaintiffs' employer as a matter of law and in advance of trial.

For these reasons, and those addressed in greater detail herein, Top Shelf respectfully requests that the Court grant the Motion in its entirety by dismissing all claims asserted against Top Shelf in this action, with prejudice.

3

## STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY

### Top Shelf Company Background and Operations

Top Shelf provides electrical consulting, electrical engineering and telecommunications services for a wide range of commercial and residential construction projects, including, without limitation, high-rise office and residential buildings, warehouses, retail stores and residential garden apartments.  (Ponticello Decl., ¶ 2.)  As part of its ordinary course of business, Top Shelf routinely engages the services of various subcontractors on its projects for a variety of reasons, including the size of the job, its location, and the then-available in-house manpower which can fluctuate based upon staffing needs for other existing or anticipated projects.  (*Id.*, ¶ 3.)  For example, as of 2018, Top Shelf subcontracted out work on approximately 20%-25% of its projects.  (*Id.*)  Such subcontractor work often includes, without limitation, rough end work (*i.e.*, wiring of individual units), finishing work (*i.e.*, installing light fixtures), fire stopping, core drilling, and excavation work.  (*Id.*)

Smaller companies that specialize in certain areas of construction work frequently approach Top Shelf looking for work as a subcontractor.  (*Id.*, ¶ 4.)  When this happens, Top Shelf first checks their qualifications (including licensing, portfolios of prior work and recommendations) and then provides them with a set of the project drawings from which the potential subcontractor calculates and submits a bid with pricing for the proposed scope of work.  (*Id.*)  Then, Top Shelf decides whether to engage the subcontractor if Top Shelf is comfortable with their qualifications and if the pricing fits within the project budget.  (*Id.*)  Depending upon the scope and complexity of the work, Top Shelf will either negotiate a Standard Purchase Order or a more formal contract with the subcontractor.  (*Id.*)  If there are subsequent changes to the scope of work, which is common, the underlying Purchase Order or contract is amended through Change Orders.

4

**Top Shelf's Employment Protocols and Practices**

When new employees are hired by Top Shelf, the company follows a routine onboarding process.  (Askew Decl., ¶ 2.)  At the commencement of a new employment relationship, and after being interviewed by Human Resources, all new employees complete a series of paperwork, including a W-4, emergency contact information and details about their job-related training, such as any OSHA certifications or other licenses.  (*Id.*)  In return, Top Shelf provides all new employees with a variety of documents and information set forth in a company-issued employee handbook, in addition to all notices as required by law.  (*Id.*)

At the inception of their employment, Top Shelf clearly articulates employees' rates of pay (which is based upon their work experience and training), and all employees are also provided with a unique PIN number.  (*Id.*, ¶ 3.)  This PIN number is what all Top Shelf laborers use to clock-in and clock-out at all of Top Shelf's job sites while using Top Shelf's on-site iPads or other tablet devices.  (*Id.*)  However, Top Shelf does not provide PIN numbers to any of its subcontractors' employees, nor do they clock-in or clock-out using Top Shelf's tablets and timekeeping systems. (*Id.*)  In addition, and as a matter of course, Top Shelf only pays its employees through formal paychecks with accompanying pay stubs.  (*Id.*, ¶ 4.)  By contrast, Top Shelf never pays its employees in cash or by personal checks.  (*Id.*)

**Top Shelf's Work at the 86th Street Project and Halletts Point Project, and Subcontracting Work to PEI**

Between 2016 and 2017, Top Shelf made successful bids for electrical subcontractor work on two apartment building projects: (1) 147-151 East 86th Street, New York, New York (the "86th Street Project"), and (2) the Halletts Point building located at 1-02 26th Avenue, Queens, New York (the "Halletts Point Project").  (Ponticello Decl., ¶ 5; Exs. A-B.)  The General Contractor of

those projects were Gilbane Residential Construction LLC ("Gilbane"), and New Line Structures & Development LLC ("New Line"), respectively.  (*Id.*)

On both the 86th Street Project and the Halletts Point Project, Top Shelf sought assistance from several subcontractors for a variety of work, including electrical work and fire stopping.  (*Id.*, ¶ 6.)  All such subcontractor work was solicited through an open bidding process.  (*Id.*)  Sometime in or around the middle of 2018, Defendant Pablo Ibepaulino arrived at Top Shelf's New Jersey office, aware that Top Shelf was still interested in subcontracting out certain roughing and finishing electrical work on both projects.  (*Id.*, ¶ 7.)  During the meeting that ensued, Mr. Ibepaulino showed Top Shelf's team several pictures of prior work performed on other jobs by his company, Defendant PEI Electrical Services Group Inc. ("PEI"), he presented a list of recommendations and credentials, and he provided proof of insurance that was then verified by Top Shelf's insurance agent.  (*Id.*)  Mr. Ibepaulino indicated that he was looking to "break into" the New York City construction field, and he was hoping this would be a great opportunity to do so.  (*Id.*)

After vetting Mr. Ibepaulino, Top Shelf provided him with a set of drawings and specifications for the jobs.  (*Id.*, ¶ 8.)  Mr. Ibepaulino then provided PEI's proposed pricing for both projects, which was in-line with other received competing bids, before the parties negotiated and ultimately agreed upon terms of separate Standard Purchase Orders.  (*Id.*; Exs. C-D.)  PEI's base pricing was premised upon fixed "per unit" rates, in other words a set sum of money to be paid depending on whether the individual apartments that PEI would be working on were one, two or three-bedroom units.  (*Id.*, ¶ 9.)  In addition, Top Shelf agreed to pay PEI at locked-in hourly rates (commonly referred to in the industry as "time and materials" work) based upon the skill level required for any additional work beyond the initial scope.  (*Id.*)  After the contract terms were

6

agreed upon, Top Shelf issued PEI's owner, Pablo Ibepaulino, with a Top Shelf email address (pibepaulino@topshelfelectric.com) for the sole and limited purpose of viewing and gaining access to large project files in Top Shelf's dropbox (*i.e.*, technical drawings and plans), so that Mr. Ibepaulino could more easily review and provide them to his employees.  (Askew Decl., ¶ 7.)  Top Shelf typically provides the owner or point-person of its subcontractors with this type of temporary email address in order to better facilitate the subcontractor's access to cumbersome project files. (*Id.*)

Once PEI was engaged by Top Shelf, it was PEI's sole responsibility to complete its assigned scope of work at both the 86th Street Project and the Halletts Point Project, however PEI felt appropriate, and with as many laborers as PEI deemed necessary.  (Ponticello Decl., ¶ 10.)  In other words, it was incumbent upon PEI to stay on schedule and timely complete the floors of the respective buildings to which it was assigned in a workmanlike manner, just like any of Top Shelf's other subcontractors.  (*Id.*)  Top Shelf did not know or have input into how PEI did its work, sourced its labor or conducted its business so long as the work got done.  (*Id.*)  In contrast to Top Shelf's formal onboarding process for new employees (Askew Decl., ¶ 2), however, multiple Plaintiffs have conceded that when they were hired for work at the 86th Street Project and/or the Halletts Point Project, they have no recollection of ever completing tax paperwork or a W-4, receiving an employee handbook, or any other company-issued forms or documents.  (Finkelstein Decl.[1], Ex. B, Dep. T. 46:14-47:1; Ex. C, Dep. T. 68:5-9; Ex. D, 43:11-17.)  Likewise, while Top Shelf clearly notifies its laborers how they will be compensated at the time they are hired (Askew Decl., ¶ 3), numerous Plaintiffs admitted to lacking any clarity as to the amount they would be

---

[1]Citations to the "Finkelstein Decl." refer to the accompanying Declaration of Jason R. Finkelstein, Esq., dated January 21, 2022.

paid when hired by PEI.  (Finkelstein Decl., Ex. B, Dep. T. 49:14-50:4; 87:18-88:15; Ex. C, Dep. T. 62:4-9; Ex. D, 41:6-42:10.)

With respect to PEI's staffing efforts, Top Shelf would only become involved if it received complaints that a particular PEI employee was disruptive or a nuisance to others at the site. (Ponticello Decl., ¶ 10.)  In such an instance, Top Shelf would notify Mr. Ibepaulino and ask that the individual be removed from the project; however, Top Shelf would have no authority to terminate the person and would not be aware of whether the person was ultimately fired or simply transferred to a different PEI project.  (*Id.*)  Top Shelf had zero involvement, knowledge or awareness as to how many laborers PEI employed for the jobs, the manner or the amount that PEI's employees were being paid, or how many hours or days per week PEI was working.  (*Id.*, ¶ 11.)  Similarly, PEI independently determined its employee schedules and breaks, which was a matter that Top Shelf did not, and would not, ever discuss with PEI or any of Top Shelf's other subcontractors.  (*Id.*)

The only involvement that Top Shelf had with PEI's hiring of laborers was when those workers would report to either the 86th Street Project or the Halletts Point Project sites for their first day of work.  (*Id.*, ¶ 12.)  On those days, PEI's laborers would initially have to meet with the particular site's General Contractor (Gilbane or New Line) and Top Shelf's site safety director in order to verify their safety credentials, and the laborers would then be supplied with a badge or ID card.  (*Id.*)  For security reasons, all workers at any job that Top Shelf works on require a site-specific badge.  (*Id.*)  The badging serves two purposes: security and safety.  (*Id.*)  First, because each employee at a job site is required to swipe the badge at a fob or scanner at the entrance gate, it prevents strangers and unauthorized persons from entering the site and potentially getting hurt or causing disruptions.  (*Id.*)  In addition, swiping the badges when entering and leaving a job site

8

creates a log of who is on-site at any particular day or time.  (*Id.*)  This way, in the event of an emergency, such as a fire, everyone can be accurately accounted for during evacuation.  (*Id.*)

The badging process was controlled by Gilbane or New Line, as applicable, at the 86th Street Project or the Halletts Point Project, and each badge cost $100, which was refundable if or when the badges were returned at the conclusion of work.  (*Id.*, ¶ 13.)  Because Top Shelf already had its credit card on file with Gilbane and New Line, Top Shelf paid the upfront $100 fee for all of its subcontractors' employees, including PEI's, as a courtesy, albeit with the expectation that the money would be recovered once the badges were ultimately returned.  (*Id.*)  This is standard procedure at all of Top Shelf's jobs.  (*Id.*)  In addition, all badges issued to employees of any of Top Shelf's subcontractors lists Top Shelf rather than the subcontracting entity.  (*Id.*)  That is because Top Shelf paid for the badges, and also because all of those subcontractors are working under Top Shelf's umbrella vis-à-vis the General Contractor.  (*Id.*)

The gates at most job sites where badges are utilized, including at the 86th Street Project and the Halletts Point Project, are controlled by the General Contractor, and not by Top Shelf.  (*Id.*, ¶ 14.)  Top Shelf does not use any badge swiping logs as a measure of timekeeping for its workers. (*Id.*)  Instead, Top Shelf's employees used their unique PIN numbers to clock-in and clock-out at the 86th Street Project and the Halletts Point Project, which was the only way their time was recorded on those jobs.  (Askew Decl., ¶ 3.)  By contrast, Top Shelf did not utilize handwritten or paper time sheets to record employees' time at either project, nor could it because Top Shelf submitted accurate, certified payroll records on both jobs.  (*Id.*)  Certified payroll submissions are standard requirements on many of Top Shelf's projects.  (*Id.*)  Plaintiffs' hours worked at the 86th Street Project and the Halletts Point Project were not recorded electronically by PEI; they were instead recorded on paper time sheets.  (*See, e.g.*, Finkelstein Decl., Ex. E.)  Plaintiffs never

9

clocked-in or clocked-out using an iPad or other tablet device.  (*Id.*, Ex. B, Dep. T. 89:2-90:14; Ex. C, Dep. T. 74:23-76:11; Ex. D, Dep. T. 51:1-8.)

**PEI's Work at the Projects and the Subsequent Termination of the Parties' Relationship**

After PEI was engaged as a subcontractor and allocated its designated scope of work, it was PEI's responsibility to get the job done – on time and accurately.  (Ponticello Decl., ¶ 15.) However, on a weekly basis, Top Shelf was required by its insurance carrier, as well as Gilbane and New Line, to perform regular safety checks and trainings for all of its on-site laborers as well as those of any Top Shelf subcontractors.  (*Id.*)  These safety checks included site walk-throughs by Top Shelf's safety director, in addition to "toolbox talks" and safety meetings on various safety topics.  (*Id.*)  For compliance purposes, Top Shelf was required to maintain sign-in sheets of all individuals who attended these meetings, regardless of what subcontractor they worked for, including PEI.  (*Id.*)  This is standard operating procedure on virtually all Top Shelf jobs.  (*Id.*)

As further demonstration of Top Shelf's commitment to job-site safety and sound business practices, Top Shelf also maintains extra cases of PPE (or personal protective equipment), such as helmets, vests, gloves and safety eyeglasses, at all of its projects.  (*Id.*, ¶ 16.)  The extra PPE is primarily made available for Top Shelf employees.  (*Id.*)  However, Top Shelf also allows its subcontractors' employees – including PEI's laborers at the 86th Street Project and the Halletts Point Project – to use them if they either do not have their own, if they get lost, ripped or broken, or if someone forgets them at home on a particular day.  (*Id.*)  Absent being equipped with proper safety equipment, laborers will not be allowed to enter the worksite, which could significantly delay the completion of work.  (*Id.*)

After PEI completed certain phases of project work (*i.e.*, a completed floor), it would submit invoices and Change Orders to Top Shelf (through Top Shelf's on-site superintendent or

foreman) identifying the number and types of apartment units completed, as well as any "time and materials" charges for additional labor at the agreed-upon hourly rates. (*Id.*, ¶ 17; Ex. E.) This process was the same on both the 86th Street Project and the Halletts Point Project. (*Id.*, ¶ 17.) This is the same process that Top Shelf follows when it submits its own invoices for payment to a project's General Contractor. (*Id.*) While PEI's invoiced "per unit" work could be visually verified by Top Shelf's on-site quality administration and quality control personnel (who were also responsible for confirming whether project work was being completed on schedule and to advise Top Shelf and its subcontractors if completed work needed to be fixed or corrected), PEI would also submit basic time sheets to Top Shelf so that Top Shelf could verify, and ultimately approve, the number of "time and materials" hours for which Top Shelf was being invoiced. (*Id.*, ¶ 18.) However, Top Shelf lacked any knowledge as to what portion of those "time and materials" charges were later paid by PEI to its employees, if any. (*Id.*) As PEI took on additional project work, Change Orders were submitted to update the original base Standard Purchase Orders. (*Id.*)

At the same time that PEI was performing work on certain floors of the buildings at the 86th Street Project and the Halletts Point Project, Top Shelf was completing the roughing and finishing work in other areas of the buildings using Top Shelf's own employees. (*Id.*, ¶ 19.) Top Shelf's employees took direction from Top Shelf's foreman, while PEI's employees took direction from PEI's on-site personnel – as is the case with every other subcontractor that Top Shelf utilized at the 86th Street Project and the Halletts Point Project. (*Id.*) The only interaction between any PEI laborer and a Top Shelf foreman or supervisor (beyond the noted safety trainings) would be if Mr. Ibepaulino or his designated point-persons were unavailable, and one of PEI's laborers had a quick question about how to fix a problem. (*Id.*) Other than that, Top Shelf's foremen and

superintendents would only communicate with PEI through either Mr. Ibepaulino or his designated representatives.  (*Id.*)  Top Shelf's employees never directed PEI's employees' specific work.  (*Id.*)

Several months into Top Shelf's relationship with PEI, Top Shelf began to notice that the quality and timeliness of PEI's work was starting to cause delays to Top Shelf's work at the 86th Street Project and the Halletts Point Project.  (*Id.*, ¶ 20.)  By late Fall of 2018, Top Shelf's on-site foremen and supervisors also started to receive complaints from PEI's laborers that they were supposedly not getting paid for their work.  (*Id.*)  This was surprising information as Top Shelf consistently and timely paid PEI all amounts due on each of its invoices.  (*Id.*; Askew Decl., ¶ 9.)

Once Antimo Ponticello, Top Shelf's Vice President of Construction, was personally notified of the non-payment issue, he immediately called Mr. Ibepaulino and demanded answers as to why he was not paying his workers, especially since Top Shelf had not missed making any payments to PEI.  (Ponticello Decl., ¶ 21.)  Mr. Ibepaulino said he would take care of it, but he apparently never did since his employees continued to express complaints.  (*Id.*)  Soon after, Mr. Ibepaulino stopped answering or returning Mr. Ponticello's telephone calls and it became clear that he was avoiding the issue.  (*Id.*)  While paying PEI's workers was not Top Shelf's responsibility, Mr. Ponticello brought this issue to Top Shelf's owners and they all agreed that Top Shelf had to immediately cut ties and terminate all of its subcontractor engagements with PEI. (*Id.*)

Since that time, Top Shelf has had no further business dealings or interaction with PEI or Mr. Ibepaulino.  (*Id.*)  For its work on the 86th Street Project, PEI was paid on all submitted invoices in an aggregate amount of $40,713.00.  (Askew Decl., ¶ 8.)  For PEI's work on the Halletts Point Project, PEI was compensated on all submitted invoices in an aggregate amount of $133,844.69.

12

(*Id.*, ¶ 9.)  Top Shelf therefore paid PEI a combined total of $174,557.69 on both jobs between August and October 2018.  (*Id.*)

Top Shelf has no record of ever employing any of the Plaintiffs – whether on the 86th Street Project, the Halletts Point Project, or otherwise.  (*Id.*, ¶ 5.)  Further, no Plaintiff appears on any of Top Shelf's certified payroll records prepared and submitted in connection with both projects, nor on Top Shelf's electronic timekeeping logs.  (*Id.*)  To the extent they have any records or recollection of any compensation received for their work at either the 86th Street Project or the Halletts Point Project, Plaintiffs received either cash or ordinary business checks issued by PEI and signed by Mr. Ibepaulino.  (Finkelstein Decl., Ex. B, Dep. T. 62:3-6 (paid in cash); Ex. C, Dep. T. 82:6-83:12 (PEI check); Ex. D, Dep. T. 82:5-25 (PEI check); Ex. F (sample PEI check).)  Top Shelf never paid its employees in cash or with personal checks at either the 86th Street Project or the Halletts Point Project.  (Askew Decl., ¶ 4.)

## Procedural History

Plaintiffs commenced this litigation by way of Complaint filed on November 12, 2020. (Dkt. No. 13.)  In the Complaint, Plaintiffs assert five (5) individual causes of action against Top Shelf and the PEI Defendants: (1) alleged failure to pay minimum wages and overtime under the FLSA; (2) alleged failure to pay minimum wages and overtime under the NYLL; (3) alleged unpaid promised wages under the NYLL; (4) alleged wage notice and wage statement violations under the NYLL; and (5) quantum meruit.  (*Id.*)  While Plaintiffs were unable to successfully effectuate service of process upon PEI or CPI, service was eventually made upon Mr. Ibepaulino on June 17, 2021.  (Dkt. No. 57.)  After Mr. Ibepaulino failed to timely respond to the Complaint, Plaintiffs sought entry of default against him, which was entered on August 12, 2021.  (Dkt. Nos.

13

58-62.)  The formal discovery period in this matter subsequently closed on November 17, 2021. (Dkt. No. 65.)

## **LEGAL ARGUMENT**

### I.      SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When moving against the party who will bear the ultimate burden of proof on an issue, "'the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  *Kwon v. Yun*, 606 F. Supp. 2d 344, 355 (S.D.N.Y. 2009) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (noting that a "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof") (internal quotations omitted).  Further, "the party opposing summary judgment 'may not rely on conclusory allegations or unsubstantiated speculation.'"  *Karpova v. Snow*, 402 F. Supp. 2d 459, 465 (S.D.N.Y. 2005) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (recognizing that a nonmoving party, in order to avoid summary judgment, "must do more than simply show that there is some metaphysical doubt as to the material facts").

For the reasons addressed hereinbelow, it is clear that Top Shelf is entitled to summary judgment and a dismissal of all claims asserted against it by Plaintiffs as a matter of law, as there are no genuinely disputed issues of material fact about the absence of any semblance of a purported employer-employee relationship between Top Shelf and any Plaintiffs.  Accordingly, even if

14

Plaintiffs can establish at trial that they were not properly paid by any of the PEI Defendants, Top Shelf cannot be held liable for same.

## II.     TOP SHELF IS NOT LIABLE FOR ANY OF PLAINTIFFS' CLAIMED DAMAGES AS THEIR ALLEGED EMPLOYER

### A.     Applicable Standards and Tests for Evaluating Alleged Employer-Employee Relationships

Under the FLSA, an "employer" is broadly defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee," while an "employee" is generally defined as "any individual employed by an employer."  29 U.S.C. § 203(d)-(e).  As for the meaning of "employ," the FLSA succinctly defines this term as to "suffer or permit to work." 29 U.S.C. § 203(g).  And while an individual employee may have multiple concurrent – or joint – "employers" for purposes of assessing liability for unpaid wages, "whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'"  *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  This requires a determination on a "case-by-case basis by review of the totality of the circumstances." *Id.* at 141-42; *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) (noting that assessment of joint employer status is based on "the circumstances of the whole activity")).

Critically, "'[w]hen it comes to 'employer' status under the FLSA, control is key.'"  *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 421 (S.D.N.Y. 2017) (J. Engelmayer) (granting summary judgment and dismissing claims based upon joint employer theories); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  As such, and as applicable to Plaintiffs' allegations here, courts within the Second Circuit typically employ two tests to assess whether an employment relationship exists: (1) a *formal* control test, and (2) a *functional* control test.  *Id.* at 422.

The "formal control" test analyzes "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). Separately, the "functional control" test weighs a series of non-exclusive factors outlined in *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003), that include the following:

> (1) whether [the alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which [the alleged employers] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the alleged employers].

> [*Zheng*, 355 F.3d at 71-72.]

As the *Zheng* Court clearly announced, a defendant is not required to establish *all* of these factors in order to obtain a ruling on summary judgment confirming the absence of a joint employer relationship. *Id.* at 77 ("To reach this conclusion, this Court need not decide that *every* factor weighs against joint employment.") (emphasis in original).

In addition, the standard for establishing "employer" status under the FLSA is nearly identical to that of the NYLL. *Martin*, 273 F. Supp. 3d at 422; *compare* 29 U.S.C. § 203(d) *with* NYLL § 190(3). Accordingly, the same tests used to evaluate alleged joint employer status under the FLSA are regularly utilized by courts in the Second Circuit to determine the same issue under the NYLL. *See, e.g., Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010); *Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013).

When applying the aforementioned well-established body of law to the facts and evidence elicited in discovery in this case, there is a complete absence of any genuinely disputed issues of material fact that should preclude this Court from granting Top Shelf summary judgment at this juncture, and holding that Top Shelf cannot be held liable as Plaintiffs' direct or joint employer as a matter of law.

> **B.  Top Shelf Was Not Plaintiffs' Employer as a Matter of Law**

The thrust of Plaintiffs' allegations in this action are that Top Shelf, which engaged PEI as an electrical subcontractor at both the 86th Street Project and the Halletts Point Project, should somehow be held liable for Plaintiffs' alleged damages on a joint employer theory of liability.[2] This misguided contention, however, wholly ignores the fact that Top Shelf maintained neither formal nor functional control over the Plaintiffs under either of the tests set forth under *Carter* or *Zheng*, respectively. Instead, employing these tests demonstrates beyond any doubt that Top Shelf cannot be held liable as Plaintiffs' joint employer, and that summary judgment should accordingly be granted in Top Shelf's favor.

> **1.  Top Shelf Did Not Maintain "Formal Control" Over the Plaintiffs**

> **a.  Top Shelf Lacked Authority to Hire or Fire Plaintiffs**

As the record of this case lays clear, there is no evidence whatsoever that Top Shelf held any authority to hire or fire any Plaintiffs while they were employed by PEI. Instead, Plaintiffs'

---

[2] While it is not entirely clear from the face of the Complaint whether Plaintiffs are actually alleging the existence of a direct employer-employee relationship with Top Shelf, it is nevertheless abundantly clear that Top Shelf was never any Plaintiff's immediate employer. Simply stated, Top Shelf never caused any Plaintiff to "suffer or permit to work." 29 U.S.C. § 203(g). To the contrary, and based on the same facts and evidence utilized to establish the absence of a joint employer relationship, the undisputed material facts of this case fully establish that, as it concerns the 86th Street Project and the Halletts Point Project, Plaintiffs were only directly employed by one or more of the PEI Defendants – *not* Top Shelf.

work at the 86th Street Project and the Halletts Point Project was entirely dependent upon their employment with Mr. Ibepaulino and PEI, which was simply one of Top Shelf's several subcontractors engaged on the projects.

First as to hiring, there is no competent evidence that has been produced in this matter remotely suggesting that Top Shelf could control Plaintiffs' hiring with PEI, nor that Top Shelf ever attempted to do so.  Top Shelf had no involvement with PEI's hiring of the Plaintiffs.  Rather, Top Shelf's first contact with the Plaintiff workers was when they initially reported to the job sites and were required to meet with Top Shelf's site safety director (as well as the site's General Contractor representative) to verify their safety credentials before being supplied with a site-specific badge as necessary for *any* person working at the job sites (regardless of who employs them) for security and safety reasons.  (Ponticello Decl., ¶ 12.)  Top Shelf played no role with PEI's hiring process, and had no other contact with the employees prior to them starting work.

Further, the manner in which Plaintiffs have testified about how they were hired stands in stark contrast to Top Shelf's ordinary hiring procedures.  As set forth in greater detail in the Askew Declaration, when new laborers are hired by Top Shelf, they must undergo a standard onboarding process, which typically includes an interview with Human Resources, completing a series of paperwork, and being provided with a company-issued employee handbook and all notices as required by law.  (Askew Decl., ¶ 2.)  In addition, new laborers are made fully aware of how they will be compensated, and they are all provided with a unique PIN number that is used to clock-in and clock-out on tablet devices supplied by Top Shelf at its job sites for timekeeping.  (*Id.*, ¶ 3.)

In contrast, there is a dearth of evidence that any Plaintiff underwent such an onboarding process at either the 86th Street Project or the Halletts Point Project.  Instead, the consistent theme among the Plaintiffs is that they showed up at either site, met with either Mr. Ibepaulino or another

18

PEI representative, were cleared with security by the applicable site's general contractor (Gilbane or New Line) and a Top Shelf representative (presumably the site safety director), and were then directed by PEI to commence work without ever having completed a W-4, receiving a company handbook or other identifiable paperwork, or even being made aware of how they would be compensated for their labors. (*See* Finkelstein Decl., Ex. B, Dep. T. 46:14-47:1; Ex. C, Dep. T. 68:5-9; Ex. D, 43:11-17.) This is the complete opposite of Top Shelf's hiring procedure and bolsters the fact that Top Shelf had no role in PEI's hiring of Plaintiffs.

There is also no genuine basis to conclude that Top Shelf had the ability to terminate any of the Plaintiffs from their employment with PEI. First, there is no allegation in this case that any of the Plaintiffs were ever terminated by anybody; they instead contend that they voluntarily left PEI after they allegedly stopped getting paid. Moreover, because Plaintiffs were PEI's employees and were hired solely by PEI, Top Shelf would have no basis or authority to terminate any of them. In the event that Top Shelf was made aware of any problematic PEI employees that were, for example, becoming a nuisance, at most Top Shelf would be able to notify Mr. Ibepaulino and ask him to remove that individual from the job site. (Ponticello Decl., ¶ 10.) However, what Mr. Ibepaulino ultimately decided to do afterwards – whether it be terminating the worker or moving him/her to another PEI job at a different location – was entirely within PEI's discretion, and was nothing that Top Shelf would ever know about or a topic about which Top Shelf would even have an opportunity to opine. (*Id.*) Clearly, all undisputed facts on this first *Carter* "formal control" factor weigh entirely in favor of Top Shelf.

    b.    <u>Plaintiffs Cannot Establish That Top Shelf Supervised or Controlled Their Work Schedules or Work Conditions</u>

The second "formal control" factor analyzes whether there is evidence sufficiently demonstrating that Top Shelf controlled Plaintiffs' work schedules or the conditions of their

employment.  Once again, the answer is a resounding "no."  Instead, the documents and testimony elicited during discovery confirm the opposite: that Top Shelf maintained zero control over Plaintiffs' schedules or their employment more generally, which were instead unilaterally dictated by PEI and Mr. Ibepaulino.  (Ponticello Decl., ¶ 11.)  Not only did Top Shelf lack control over these matters, but Top Shelf was never even made aware of such information.  (*Id.*)  The 86th Street Project and the Halletts Point Project functioned like any other project where Top Shelf engaged the services of subcontractors.  Top Shelf provided the subcontractor – here, PEI – with plans and a schedule for completing its work, and it was entirely incumbent upon the subcontractor to complete the work however it deemed appropriate.  (*Id.*, ¶ 10.)  In the same way that Top Shelf's foremen would give direction to Top Shelf's laborers, PEI's employees took direction from PEI's on-site personnel.  (*Id.*, ¶ 19.)

Top Shelf's only requirement was that the subcontractor's work be completed correctly and on schedule.  (*Id.*, ¶ 10.)  How many employees a subcontractor like PEI staffed to a job, how many hours they worked each day, and how the laborers were paid was not in Top Shelf's discretion.  Top Shelf's only supervisory role over PEI's work occurred when on-site quality administration and quality control personnel, who were responsible for confirming whether project work was being completed on schedule and in a proper workmanship manner, would advise either Mr. Ibepaulino or his designated point-person whether their work needed to be corrected.  (*Id.*, ¶ 18.)  By contrast, Top Shelf would never specifically direct PEI's employees' actual work beyond answering a quick question about how to resolve a problem if Mr. Ibepaulino or another PEI supervisor was unavailable to respond.  (*Id.*, ¶ 19.)

On this point, it is well-established that merely exercising "quality control by having strict standards and monitoring compliance with those standards does *not constitute supervising and*

*controlling employees' work conditions*."  *Martin*, 273 F. Supp. 3d at 426 (quoting *Godlewska v. Human Dev. Ass'n, Inc.*, 916 F. Supp. 2d 246, 259 (E.D.N.Y. 2013), *aff'd* 561 Fed.Appx. 108 (2d Cir. 2014)) (emphasis added).  *See also Chen v. Street Beat Sportswear, Inc.* 364 F. Supp. 2d 269, 286 (E.D.N.Y. 2005) ("[T]he Court will not consider evidence plaintiffs present with respect to this factor to the extent it concerns the present of . . . quality control personnel . . . to monitor the quality of the work."); *Zheng*, 355 F.3d at 74-75.  Accordingly, this second "formal control" factor under *Carter* once again overwhelmingly weighs in Top Shelf's favor.

  c. <u>Top Shelf Did Not Control the Rate or Method of Plaintiffs' Compensation from PEI</u>

  The third factor under the *Carter* "formal control" test asks whether Top Shelf controlled the rate and method of Plaintiffs' compensation.  As a threshold matter, Top Shelf never knew, and still does not know, how and at what rate PEI compensated its employees, and there is no basis to conclude that Top Shelf ever did.  Top Shelf's subcontractor engagement with PEI was very simple: PEI was to be paid a fixed, "per unit" rate for each apartment unit that it completed, and PEI would also be paid a predetermined hourly "time and materials" rate for any additional work that was required.  (Ponticello Decl., ¶ 9.)  When Top Shelf received invoices and Change Orders reflecting such completed work, PEI was paid the invoiced amounts.  (*Id.*, 20; Askew Decl., ¶ 9.) However, Top Shelf did not know what portion of those payments were being paid to PEI's workers and Top Shelf did not have any input about it.  (Ponticello Decl., ¶ 18.)

  Critically, since there is no evidence to the contrary, there can be no legitimate dispute on this issue.  *See Karpova*, 402 F. Supp. 2d at 465; *Matsushita*, 475 U.S. at 586.  At most, Top Shelf received basic timesheets from PEI to prove that its employees worked the amount of "time and materials" hours listed on a particular "time and materials" invoice.  (*Id.*, ¶ 18.)  But just because Top Shelf was being billed, for example, for twenty hours of additional time for two laborers on a

21

particular invoice, that reflected nothing about how much money those two laborers might ultimately be paid by PEI.  This was simply the amount to be paid to PEI, and as with all time and materials payments, they include not only the cost of the labor, but also an unstated amount for profit and overhead (including insurance) for the subcontractor's employee.

Further on this point, while Top Shelf only pays its employees through formal paychecks as opposed to personal checks or cash (Askew Decl., ¶ 4), Plaintiffs' discovery productions and deposition testimony has not included or referenced a single payroll check from Top Shelf, and instead only cash or business checks from PEI (Finkelstein Decl., Ex. B, Dep. T. 62:3-6 (paid in cash); Ex. C, Dep. T. 82:6-83:12 (PEI check); Ex. D, Dep. T. 82:5-25 (PEI check); Ex. F (sample PEI check)).  As Top Shelf clearly lacked control over the rate or method of Plaintiffs' compensation from PEI, this third *Carter* factor again disfavors a finding of formal control by Top Shelf.

        d.     <u>Top Shelf Did Not Maintain or Have Access to Plaintiffs' Employment Records</u>

As it concerns the fourth and final "formal control" factor, the Court must also assess whether Top Shelf maintained or had access to Plaintiffs' employment records.  To the extent Plaintiffs have any employment records for their work at the 86th Street Project or the Halletts Point Project, those would be uniquely within the PEI Defendants' possession, and not Top Shelf's.  As noted, Top Shelf lacked any awareness of how PEI conducted its business including its human resources functions, and Top Shelf is not in possession of any employment records for any of the Plaintiffs.  (Askew Decl., ¶ 5.)  All Top Shelf did was ensure that PEI's employees were cleared with security and received a badge – as is the case with every single one of Top Shelf's subcontractors' employees.  (Ponticello Decl., ¶ 12.)  Beyond facilitating badges, Top Shelf's only other "records" of any of the Plaintiffs would consist of names listed on sign-in sheets that were

maintained by Top Shelf's safety director during weekly "toolbox talks" and safety meetings.  (*Id.*, ¶ 15.)   Top Shelf was required to record this information for compliance purposes with its insurance carrier, and those lists would include Top Shelf's employees as well as the names for any of its subcontractors' employees who attended those meetings.  As with the badging process, this is standard procedure for virtually all Top Shelf jobs.  (*Id.*)

Based upon the foregoing, the fourth factor announced in *Carter* – consistent with each of the prior three – all demonstrate that Top Shelf lacked any "formal control" over Plaintiffs.  As such, Top Shelf, as a matter of law, cannot be deemed their "employer" or be held liable for any alleged nonpayment of wages.

## 2.    Top Shelf Likewise Did Not Possess Any "Functional Control" Over Plaintiffs

### a.    Top Shelf's Premises and Equipment Was Not Used for Plaintiffs' Work

As noted, in addition to the "formal control" test announced in *Carter*, courts in this Circuit also analyze whether an employer-employee relationship can be gleaned from a series of "functional control" factors outlined in *Zheng, supra*.  The first such factor assesses whether the "putative joint employer's premises and equipment are used by its putative joint employees." *Zheng*, 355 F.3d at 72.  Here, and as relevant to this case, Plaintiffs allege that they performed services at the 86th Street Project and the Halletts Point Project.  Similar to PEI, Top Shelf was nothing more than a subcontractor at the sites, and there is no claim, suggestion or evidence that Top Shelf had any ownership or other interest in either property (which it did not).  Therefore, Plaintiffs were not performing work at Top Shelf's premises, which would be at one of Top Shelf's formal offices.  At best, Plaintiffs have testified that they would enter Top Shelf's shanty located at the job sites when they arrived for their first day of work with PEI.  Assuming that is true for purposes of this Motion, any time spent at Top Shelf's shanty would have been for initial

23

processing for security purposes *only*, as is standard for all Top Shelf subcontractors' employees. (Ponticello Decl., ¶ 12.)  This alone cannot demonstrate functional control of any sort.

With respect to equipment, there is likewise no evidence or testimony that has been elicited in discovery suggesting that Plaintiffs used Top Shelf's tools and equipment to perform their work for PEI.  As noted, how PEI performed its work was up to PEI and Mr. Ibepaulino, including what tools PEI would supply for Plaintiffs or what tools Plaintiffs were instead required to bring on their own each day.  The only materials that Top Shelf *made available* at the 86th Street Project and the Halletts Point Project sites, like it does at all of its job sites, were cases of extra PPE materials, such as vests, helmets, gloves and protective glasses.  (Ponticello Decl., ¶ 16.)  Those items are available for Top Shelf's employees as well as the employees for any of Top Shelf's subcontractors who either do not have the necessary PPE, if theirs has been ripped, lost or broken, or if they leave their own at home by accident; because without the PPE, the laborers will not be permitted onto the job site.  (*Id.*)  This is done universally across Top Shelf's job sites, and nobody is actually required to use Top Shelf's materials; it is simply there as an accommodation to Top Shelf's subcontractors and to minimize delays with the completion of work.  (*Id.*)  Plaintiffs clearly cannot satisfy this initial "functional control" factor.

     b.     <u>Whether Immediate Employer's Business Shifts as a Unit</u>

The second factor under *Zheng* considers whether PEI's business, as Plaintiffs' immediate employer, "*could* or did shift as a unit from one putative joint employer to another." *Jean-Louis v. Metro. Cable Communications, Inc.*, 838 F. Supp. 2d 111, 132 (S.D.N.Y. 2011) (emphasis in original) (granting summary judgment and finding no formal or functional control over technician-plaintiffs).  As such, the question is not whether PEI's services actually did shift between Top Shelf and another contractor, but whether they *could* have.  Here, this is no contention that PEI had any sort of exclusive engagement with Top Shelf.  In fact, the opposite was true: Top Shelf

only hired PEI as a subcontractor on the 86th Street Project and Halletts Point Project because of PEI's portfolio of work performed on other jobs with other contractors and subcontractors. (Ponticello Decl., ¶ 7.)

In addition, and as has been addressed *supra*, Top Shelf lacked any control or awareness about how PEI completed its work on the 86th Street Project and Halletts Point Project, whether that be with two or twenty or more laborers.  (*Id.*, ¶ 10.)  Therefore, if PEI had been engaged for work at another project while it was still working at the 86th Street Project and Halletts Point Project, there would have been nothing stopping PEI from either hiring additional laborers or shifting some from site to site.  Simply stated, this second *Zheng* factor does not signal a joint employment relationship between Top Shelf and PEI.

### c.    Whether Plaintiffs Have Discrete Line Jobs

The next "functional control" factor analyzes "the extent to which [Plaintiffs] performed a discrete line job that was integral to the purported joint employer's process of production."  *Hugee v. SJC Group, Inc.*, 2013 WL 4399226, at *9 (S.D.N.Y. Aug. 14, 2013) (quoting *Zheng*, 355 F.3d at 72).  However, if "[i]nterpreted broadly, this factor could be said to be implicated in every subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service."  *Jean-Louis*, 838 F. Supp. 2d at 133-34 (quoting *Zheng*, 355 F.3d at 73).  Courts have therefore "questioned whether this factor translates well outside of the production line employment situation."  *Godlewska*, 916 F. Supp. 2d at 263 (quotation omitted).  Thus, "insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws."  *Zheng*, 355 F.3d at 73.

Here, the undisputed evidence demonstrates that Top Shelf not only routinely engages subcontractors on many of its jobs to perform a variety of services, but that it specifically did so

at both the 86th Street Project and the Halletts Point Project.  (Ponticello Decl., ¶¶ 3, 6.)  PEI was one of several such subcontractors that Top Shelf engaged.  And anyone with even a rudimentary understanding of the construction industry knows that subcontractors are a common, instrumental component to completing work.  There is thus no basis to conclude that Top Shelf's mere ordinary-course engagement of PEI as a subcontractor was somehow a "subterfuge" or that it evidences any functional control by Top Shelf over PEI or its laborers.  If that were the case, and as stated in *Jean-Louis*, practically every single construction project would find itself subject to joint employer claims.  Clearly, that cannot be the intended result.

      d.    <u>Whether Plaintiffs' Work Was Fungible</u>

Under the fourth *Zheng* factor, which examines whether responsibilities under the at-issue contracts could easily pass between subcontractors without material changes, when "employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employer relationship exists."  *Zheng*, 355 F.3d at 72.  "[T]he Second Circuit has stated that if the fourth factor 'weigh[ed] in favor of joint employment when a general contractor uses numerous subcontractors who compete for work and have *different* employees,' the fourth factor 'would classify nearly all subcontracting relationships as joint employment relationships – a result that finds no support either in the law or in our country's practices.'"  *Martin*, 273 F. Supp. 3d at 432 (quoting *Jean-Louis*, 838 F. Supp. 2d at 135).  This factor therefore "asks not whether all of the putative joint employer's contractors do the same work but whether, if the putative joint employer hired one contractor rather than another, 'the *same* employees would continue to do the *same* work in the *same* place.'"  *Jean-Louis*, 838 F. Supp. 2d at 135 (quoting *Zheng*, 355 F.3d at 74) (emphasis in original).

As the record of this case makes abundantly clear, this factor once again weighs against a finding of joint employer status as to Top Shelf.  The *only* reason why any of the Plaintiffs worked at the 86th Street Project or the Halletts Point Project was because they were employed by PEI, as Top Shelf engaged PEI to perform certain subcontractor electrical services on those jobs after PEI's bids were selected by Top Shelf during an open bidding process.  (Ponticello Decl., ¶ 6.)  Thus, if PEI's bids had been rejected, a completely different subcontractor would have been engaged to assist performing the roughing and finishing work at both sites with its own employees – not the Plaintiffs (unless, of course, they somehow independently gained employment with one of those other subcontractors by coincidence).  Further, when PEI was terminated after Top Shelf learned that it was not paying its employees towards the end of 2018, it is undisputed that the Plaintiffs did not continue to work at either location under Top Shelf or a different subcontractor.  Because of these practical considerations, this fourth factor cannot establish any form of "functional control" between Top Shelf, on the one hand, and PEI and Plaintiffs, on the other.

     e.    <u>Degree of Top Shelf's Supervision of Plaintiffs</u>

The fifth "functional control" factor considers how much Top Shelf supervised Plaintiffs' work at the 86th Street Project or the Halletts Point Project.  This assessment "is 'largely the same' as the inquiry under the second [formal control] factor and is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs." *Godlewska*, 916 F. Supp. 2d at 264 (quoting *Jean-Louis*, 838 F. Supp. 2d at 126 n.7).  Because this factor has already been addressed at length at Section B.1.b, *supra*, Top Shelf will not reiterate those facts again here.  However, Top Shelf maintains that those circumstances once again prove the absence of any functional control.

f.      Plaintiffs' Exclusive or Predominant Work

Under the sixth and final *Zheng* factor, this Court must assess whether Plaintiffs worked exclusively or predominately for Top Shelf, if at all.  Here, the evidence is clear that the Plaintiffs did not work exclusively or predominately for Top Shelf.  Top Shelf did not have any formal of exclusive arrangement with PEI or any of the Plaintiffs.  What Plaintiffs did when they were not working for PEI at the 86th Street Project or the Halletts Point Project is not something about which Top Shelf would have any awareness whatsoever.  Moreover, and we submit conclusive on this issue, when PEI was terminated the Plaintiffs no longer worked at these job sites; it was at most temporary work for a subcontractor of Top Shelf, which work ended when the relationship with the subcontractor – PEI – ended.  Therefore, even if Plaintiffs were to claim that they exclusively or predominately worked at the 86th Street Project or the Halletts Point Project between August and October 2018, that is a far cry from evidencing that Top Shelf had any functional control over those circumstances and that Plaintiffs exclusively worked on Top Shelf projects, which they did not.

In sum, and as was the case with the "formal control" test established under *Carter*, Plaintiffs cannot establish a direct or joint employer theory of liability against Top Shelf under any of the *Zheng* "functional control" factors.  Under these circumstances, and in the absence of any genuinely disputed issues of material fact on these issues, this Court, respectfully, should conclude that Top Shelf was not Plaintiffs' employer as a matter of law, and therefore cannot be held liable for any alleged unpaid wages claimed in this litigation.

## <u>CONCLUSION</u>

For all the foregoing reasons, Top Shelf respectfully submits that this Court should grant summary judgment in favor of Top Shelf on all claims asserted against them in Plaintiffs' Complaint. Whether assessed under the "formal control" test established in *Carter* or the "functional control" factors announced in *Zheng*, Top Shelf cannot be held liable for Plaintiffs' alleged unpaid wages for the period of their employment with the PEI Defendants, either under a direct or joint employer theory. There is a complete absence of any genuinely disputed issues of material fact on these matters. For these reasons, Top Shelf's Motion should respectfully be granted in its entirety.


DATED:      New York, New York            Respectfully submitted,
            January 21, 2022
                                          **COLE SCHOTZ P.C.**


                                          By: */s/ Brian L. Gardner*
                                              Brian L. Gardner
                                              Jason R. Finkelstein
                                              *Attorneys for Defendant, Top Shelf*
                                              *Electric Corp.*
                                              1325 Avenue of the Americas
                                              Suite 1900
                                              New York, NY 10019
                                              (212) 752-8000