UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ALIRIO ZAVALA et al.,                                            :

                                                                 :          <u>REPORT & RECOMMENDATION</u>
                              Plaintiffs,
                                                                 :          20 Civ. 9437 (PAE) (GWG)
          -v.-
                                                                 :
PEI ELECTRICAL SERVICES GROUP
INC. et al.,                                                     :

                              Defendants.                        :
---------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

          Plaintiffs Alirio Zavala, Juan Carlos Diaz, Alexander Gonzalez, Jaume Villagrasa, Luis

Torres, Jose Briceno, Luciano Emigdio, Nicolas Velasquez, Gustavo Rangel, Arodis Herrera,

Jorge Guerrero, Segundo Morales Martinez, Sahagun Merejildo, Jaime Granada, John Jamie

Rivera Alayon, Andres Torres, Ernesto Alejandro Sanchez, and Eduardo Cruz Gonzalez brought

this case against defendants PEI Electrical Services Group Inc. ("PEI"), CPI Electrical Services

Inc., Top Shelf Electric Corp. ("Top Shelf"), and Pablo Ibepaulino, alleging violations of the Fair

Labor Standards Act, 29 U.S.C. § 201, <u>et seq.</u>, and the New York Labor Law, § 190, <u>et seq.</u>  <u>See</u>

Complaint, filed Nov. 12, 2020 (Docket # 13) ("Comp.").  Top Shelf has moved for summary

judgment dismissing all claims against it.[1]  For the reasons that follow, Top Shelf's motion

should be denied.

---

          [1]  <u>See</u> Motion for Summary Judgment, filed Jan. 21, 2022 (Docket # 80); Declaration of
Jason Finkelstein in Support, filed Jan. 21, 2022 (Docket # 81); Declaration of Cathy Askew in
Support, filed Jan. 21, 2022 (Docket # 82) ("Askew Decl."); Declaration of Antimo Ponticello in
Support, filed Jan. 21, 2022 (Docket # 83) ("Ponticello Decl."); Memorandum of Law in
Support, filed Jan. 21, 2022 (Docket # 84) ("Def. Mem."); Rule 56.1 Statement of Undisputed
Facts, filed Jan. 21, 2022 (Docket # 85) ("Def. 56.1 Statement"); Memorandum of Law in
Opposition, filed Mar. 5, 2022 (Docket # 87) ("Pl. Mem."); Declaration of Estee L. Ward in
Opposition, filed Mar. 5, 2022 (Docket # 88) ("Ward Decl."); Rule 56.1 Counterstatement of
Material Facts, filed Mar. 5, 2022 (Docket # 89) ("Pl. 56.1 Statement"); Response to Plaintiffs'

I.      FACTS

Unless otherwise stated, the following facts are either undisputed or taken in the light most favorable to plaintiffs, the non-movants.

Top Shelf provides electrical consulting, engineering, and telecommunications services for commercial and residential construction projects.  See Ponticello Decl. ¶ 2.  Top Shelf routinely engages subcontractors to work on such projects.  See id. ¶ 3.  Between 2016 and 2017, Top Shelf made successful bids for electrical subcontractor work on two apartment construction projects: (1) 147-151 East 86th Street, New York, New York (the "86th Street Project"); and (2) 1-02 26th Avenue, Queens, New York (the "Halletts Point Project").  Id. ¶ 5.  For both projects, Top Shelf sought the assistance of subcontractors for "roughing" and "finishing" electrical work. See id. ¶¶ 6-7.

In 2018, Ibepaulino came to Top Shelf's office and expressed interest in subcontracting with Top Shelf on the 86th Street and Halletts Point Projects.  See id. ¶ 7.  Top Shelf vetted Ibepaulino and provided him with specifications for the two projects.  See id. ¶¶ 7-8.  The parties formalized the subcontracting agreement by means of purchase orders.  See id. ¶ 8.  Under these purchase orders, Ibepaulino's company, PEI, was to be paid on a "per-unit" basis, which set fixed sums to be paid for each apartment unit in which PEI would work.  See id. ¶ 9.  Top Shelf also agreed to pay PEI predetermined hourly rates for additional work beyond the scope of the initial contract.  Id.  Top Shelf then provided Ibepaulino a Top Shelf email address so Ibepaulino could access certain project files in Top Shelf's Dropbox.  See Askew Decl. ¶ 7.

---

Rule 56.1 Statement, filed Apr. 22, 2022 (Docket # 96) ("Def. 56.1 Counterstatement"); Reply Memorandum of Law, filed Apr. 22, 2022 (Docket # 97) ("Def. Reply"); Declaration of Cathy Askew in Support, filed Apr. 22, 2022 (Docket # 98); Declaration of Colin Scholes in Support, filed Apr. 22, 2022 (Docket # 99) ("Scholes Decl."); Sur-Reply in Further Opposition, filed May 9, 2022 (Docket # 103); Response to Sur Reply, filed May 11, 2022 (Docket # 104).

The plaintiffs in this case worked at both the 86th Street and Halletts Point Projects. Some were directly hired by Ibepaulino; others never met him.  Compare Declaration of Alexander Gonzalez, annexed as Ex. F to Ward Decl. (Docket # 88-6) ("Gonzalez Decl."), ¶ 4, with Declaration of Ernesto Alejandro Sanchez, annexed as Ex. M to Ward Decl. (Docket # 88-13) ("Sanchez Decl."), ¶ 12.  Some plaintiffs learned of the opportunity through friends or family.  See, e.g., Declaration of Jamie Granada, annexed as Ex. G to Ward Decl. (Docket # 88-7) ("Granada Decl."), ¶ 4; Declaration of Segundo Martinez Morales, annexed as Ex. J to Ward Decl. (Docket # 88-10) ("Morales Decl."), ¶ 4; Sanchez Decl. ¶ 4.  No plaintiff was recruited by Top Shelf, and there is no admissible evidence that Top Shelf was involved in the hiring of any plaintiff in this case.[2]

When plaintiffs arrived at the worksite, they would first report to an office space, or "shanty," operated by Top Shelf at the worksite.  See, e.g., Sanchez Decl. ¶ 5; Gonzalez Decl. ¶ 5; Declaration of Arodis Herrera, annexed as Ex. I to Ward Decl. (Docket # 88-9) ("Herrera Decl."), ¶ 5.  At the shanty, plaintiffs had their safety credentials verified and were given an ID badge with Top Shelf's logo on it, which was used to access the worksites.  See, e.g., Sanchez Decl. ¶ 6; Ponticello Decl. ¶¶ 12-14.  Top Shelf paid for the badges of both its employees and its subcontractors' employees.  See Ponticello Decl. ¶ 13.  Plaintiffs were also given safety training — which recurred on a weekly basis, as required by Top Shelf's insurance carrier and the 86th Street and Halletts Point Projects' general contractors.  See, e.g., Declaration of John Jamie

---

[2]  The statement contained in Declaration of Jose Briceno, annexed as Ex. B to Ward Decl. (Docket # 88-2) ("Briceno Decl."), ¶ 4 — repeating the statement of a "family member" as to his contact with "Top Shelf employees" — is inadmissible hearsay under Fed. R. Evid. 802 and thus we do not consider it.

Rivera Alayon, annexed as Ex. A to Ward Decl. (Docket # 88-1) ("Alayon Decl."), ¶ 5; Ponticello Decl. ¶ 15.

As to whether Top Shelf had any role in setting plaintiffs' hours, the plaintiffs are largely silent on how they were informed of their hours. Plaintiff Alexander Gonzalez, however, states that an unidentified person wearing a Top Shelf vest and hard hat whom he understood to be a Top Shelf employee told him on his first day that his working hours would be from 7 a.m. to 4 p.m. See Gonzalez Decl. ¶¶ 5, 7. "On a few occasions," people identified only as "Top Shelf supervisors" asked the plaintiffs as a group to stay past their scheduled shifts, Herrera Decl. ¶ 14; Granada Decl. ¶ 14, or told the plaintiffs they could leave early, see Declaration of Juan Carlos Diaz, annexed as Ex. D to Ward Decl. (Docket # 88-4) ("Diaz Decl."), ¶ 16. Plaintiffs have also submitted some "sign-in sheets" which they represent constitute employment records maintained by Top Shelf, a contention we evaluate in Section III.B.1.iv below. There is no evidence that Ibepaulino or anyone else from PEI informed plaintiffs of their work schedules.

At the 86th Street and Halletts Point Projects, Top Shelf made available to all workers personal protective equipment ("PPE"), including vests, hardhats, and safety goggles. See Ponticello Decl. ¶ 16. Morales states that he was also given "t-shirts." Morales Decl. ¶ 9. Top Shelf states without contradiction that the safety equipment was provided to ensure that workers at the sites were able to work even in the event they lacked, or lost, their own PPE. See Ponticello Decl. ¶ 16. Absent proper PPE, a worker would not be permitted into the worksite. See id. There is no evidence that Top Shelf required anyone to wear any Top Shelf-branded equipment or clothing. There is also no evidence that plaintiffs ever wore uniforms or equipment mentioning PEI. See Pl. 56.1 Statement ¶ 31. In addition to obtaining PPE from Top Shelf, plaintiffs regularly collected materials necessary to complete their work — including cables and

outlets — from Top Shelf's shanty or from a warehouse near the shanty.  See Alayon Decl. ¶ 9;

Gonzalez Decl. ¶ 14; Morales Decl. ¶ 13.

At the Halletts Point site, plaintiffs received day-to-day instructions in two main ways.

First, Top Shelf supervisors would transmit instructions to the group through a particular

plaintiff, such as Luis Torres, Jaime Granada, or Jaume Villagrasa.  See, e.g., Alayon Decl. ¶ 6;

Morales Decl. ¶ 19; Declaration of Jaume Villagrasa, annexed as Ex. P to Ward Decl. (Docket

# 88-16) ("Villagrasa Decl."), ¶ 9.  Second, a Top Shelf employee — often, Pat Verno — would

supervise plaintiffs directly.  See, e.g., Declaration of Luis Torres, annexed as Ex. O to Ward

Decl. (Docket # 88-15) ("L. Torres Decl."), ¶¶ 4-11.  Plaintiffs referred to Verno as the "boss,"

and he was "on site almost every day."  Alayon Decl. ¶¶ 6, 10.  Ibepaulino told Torres that if

plaintiffs had any questions or issues, they should "let Pat know."  L. Torres Decl. ¶ 4.

The "layout plans" for the Halletts Point Project originated from Top Shelf and were

forwarded to Luis Torres by Ibepaulino.  See id. ¶ 6; id. Ex. 2.  Top Shelf also provided copies of

the plans to some plaintiffs directly.  See, e.g., Villagrasa Decl. ¶ 11; Declaration of Andres

Torres, annexed as Ex. N to Ward Decl. (Docket # 88-14) ("A. Torres Decl."), ¶ 11.  Luis Torres

would review the blueprints with Verno, who would answer questions about the plans.  L. Torres

Decl. ¶¶ 6-8.  If additional materials were required, Torres would speak with Verno.  Id. ¶ 11.

Eduardo Cruz Gonzalez similarly met with Verno for at least an hour per day to obtain

instructions.  See Declaration of Eduardo Cruz Gonzalez, annexed as Ex. C to Ward Decl.

(Docket # 88-3) ("Cruz Decl."), ¶ 8.  Verno would state what needed to be done each day and

instruct Cruz as to where materials could be obtained.  See id.  Verno told plaintiffs which floors

were his priorities.  See L. Torres Decl. ¶ 9.  Once certain work was completed, Verno would

provide new assignments.  See id.  When plaintiffs received conflicting instructions, Verno

would resolve the conflicts.  See Alayon Decl. ¶ 13.  When work needed to be corrected, Verno

would "explain what the issue was and how to fix it."  Id. ¶ 8.  Verno's supervision was as

detailed as instructing a worker on "how to install outlets properly or what cable to use."  Alayon

Decl. ¶ 11.

At the 86th Street site, Top Shelf employees would assign plaintiffs to work on particular

floors, see Declaration of Jorge Guerrero, annexed as Ex. H to Ward Decl. (Docket # 88-8)

("Guerrero Decl."), ¶ 6; "give instructions based on the layout plans," id. ¶ 8; bring plaintiffs the

materials required to complete their work, Herrera Decl. ¶ 6; and perform quality checks of

plaintiffs' work, see Morales Decl. ¶ 12.

Throughout plaintiffs' employment, Top Shelf employed its own workers at the 86th

Street and Halletts Point Projects.  These workers did the same "roughing" and "finishing"

electrical work as plaintiffs, but on separate floors.  See Def. 56.1 Statement ¶ 34; Pl. 56.1

Statement ¶ 34.  Top Shelf hired, controlled, and paid these workers, see Askew Decl. ¶¶ 2-4,

Ponticello Decl. ¶ 19, but it is uncontested that Top Shelf did not set plaintiffs' rate or method of

pay, and plaintiffs' wages were never directly paid by Top Shelf.  Instead, Ibepaulino submitted

invoices to Top Shelf, which Top Shelf paid.  See Def. 56.1 Statement ¶¶ 41-42; Pl. 56.1

Statement ¶¶ 41-42.  Plaintiffs were then paid in cash or by business checks from PEI.  See Def.

56.1 Statement ¶ 44; Pl. 56.1 Statement ¶ 44.

At some point, plaintiffs complained to Top Shelf supervisors that they were not being

paid and were told, inter alia, to bring their complaints to "the Top Shelf main office."  Gonzalez

Decl. ¶¶ 18-20; see also Diaz Decl. ¶ 18.  The plaintiffs did so.  See, e.g., Ponticello Decl. ¶ 20.

Top Shelf attempted to address the issue with Ibepaulino, who responded that he would handle it

but then ignored Top Shelf's efforts to follow up.  See id. ¶ 21.  Unable to resolve the matter,

Top Shelf terminated PEI's contract.  See id.; Askew Decl. ¶ 9.  Around this time, plaintiffs

stopped working on the 86th Street and Halletts Point Projects.  See, e.g., Sanchez Decl. ¶ 14;

Villagrasa Decl. ¶¶ 16-17.

II.     LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court shall grant

summary judgment when "the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine

issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In

determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is

to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving

party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)); accord

Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001) ("[A]ll reasonable inferences

must be drawn against the party whose motion is under consideration.").

Once the moving party has shown that there is no genuine issue as to any material fact

and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward

with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (internal quotation

omitted), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v.

Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases).  See Fed. R. Civ. P. 56(c), (e).  In

other words, the nonmovant must offer "concrete evidence from which a reasonable juror could

return a verdict in his favor."  Anderson, 477 U.S. at 256.  Where "the nonmoving party bears

the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a

showing sufficient to establish the existence of an element essential to its case." <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590 (1993) (punctuation and quotation omitted).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." <u>Allen v. Cuomo</u>, 100 F.3d 253, 258 (2d Cir. 1996) (citing <u>Anderson</u>, 477 U.S. at 247-48); <u>accord</u> <u>El-Nahal v. Yassky</u>, 835 F.3d 248, 252, 256 (2d Cir. 2016).

III.    DISCUSSION

        A.    Governing Law

              1.    "Employer" under the FLSA

        The FLSA imposes liability on the "employer" of any person who violates the FLSA's minimum wage, overtime, and retaliation provisions.  <u>See</u> 29 U.S.C. § 216(b), (e)(2).  The FLSA defines "employer" as an entity "acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  It includes "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a), (d).

        The Second Circuit has held that an employment relationship exists under the FLSA when the "economic reality" is such that the "alleged employer possessed the power to control the workers in question."  <u>Herman v. RSR Sec. Servs. Ltd.</u>, 172 F.3d 132, 139 (2d Cir. 1999) (citing <u>Carter v. Dutchess Cmty. Coll.</u>, 735 F.2d 8, 12 (2d Cir. 1984)).  Additionally, a worker performing a task may simultaneously do so on behalf of more than one "joint employers." <u>Zheng v. Liberty Apparel Co.</u>, 355 F.3d 61, 66 (2d Cir. 2003).  When two or more entities operate as joint employers of a given worker, each employer is jointly and severally liable for the

FLSA violations of all other joint employers.  See Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 196 (S.D.N.Y. 2003).

The Second Circuit has developed four tests for determining whether a person or entity is an employer, including a joint employer.  See Greenawalt v. AT&T Mobility LLC, 642 F. App'x 36, 37 (2d Cir. 2016) (summary order) (citing Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 142-43 (2d Cir. 2008)); Sanchez v. KTG Multiservices, Inc., 2022 WL 1948824, at *3 (S.D.N.Y. June 6, 2022).  The first test was articulated in Carter and looks to whether an employer exercised "formal control" over a worker.  Under this test, a court considers whether an entity: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  735 F.2d at 12 (citation omitted).  "[W]hen an entity exercises those four prerogatives, that entity, in addition to any primary employer, must be considered a joint employer."  Zheng, 355 F.3d at 67.

A second test, articulated in Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988), is "more relevant for distinguishing between independent contractors and employees," Valez v. Sanchez, 693 F.3d 308, 326 (2d Cir. 2012), because the focus is on whether "the workers depend upon someone else's business . . . or are in the business for themselves," Brock, 840 F.2d at 1059.  That test does not apply here.

The third test, outlined in Zheng, 355 F.3d at 72-76, weighs six "nonexclusive and overlapping" factors to determine if an employer had "functional control" over workers.  Case law has recognized that the Zheng factors "are most relevant in the context of subcontractor relationships."  Fernandez v. HR Parking Inc., 407 F. Supp. 3d 445, 451 (S.D.N.Y. 2019) (citation omitted).  Zheng involved a garment manufacturer who contracted with other entities to

have workers stitch and finish pieces of clothing. Zheng, 355 F.3d at 63. To determine whether the manufacturer was a joint employer with the contractors, the Zheng court looked to:

> (1) whether [the manufacturer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the manufacturer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [the manufacturer] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [the manufacturer].

Id. at 72. Zheng makes clear that not every factor needs to weigh against joint employment in order for a defendant to be entitled to summary judgment. Id. at 76-77.

In addition, courts have used the "single integrated enterprise" or "single employer" doctrine to determine whether it should "treat a group of distinct but closely affiliated entities as a single employer for FLSA purposes." Hernandez v. Delta Deli Mkt. Inc., 2019 WL 643735, at *3 (E.D.N.Y. Feb. 12, 2019). There is no contention that this doctrine applies to the instant case, so we do not consider it.

2.      "Employ[er]" under the NYLL

The NYLL's definition of employment is nearly identical to the FLSA's. Compare 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."), with N.Y. Lab. Law § 2(7) ("'Employed' includes permitted or suffered to work."). As a result, courts in this circuit "hold that the New York Labor Law embodies the same standards for joint employment as the FLSA." Chen v. St. Beat Sportswear, Inc., 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005) (citing cases); accord Spicer v. Pier Sixty LLC, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) ("[C]ourts have

interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." (alteration in original) (citation omitted)).

Accordingly, this Court's conclusions with respect to Top Shelf's status as an employer under the FLSA apply equally to its status under the NYLL.

B.    Application

1.    Formal Control

We begin by examining the four "formal control" factors under Carter.

i.    Power to Hire and Fire

First, we ask whether Top Shelf possessed the power to hire and fire plaintiffs.  Plaintiffs admit that "Top Shelf did not hire or fire [p]laintiffs during the time at issue."  Pl. Mem. at 21. Nonetheless, plaintiffs argue this factor is met because "Top Shelf did initial paperwork with new hires and oriented workers on their first day."  Id.  The fact that there was "initial paperwork" and an orientation, however, tells us nothing about whether Top Shelf had the power to hire and fire the plaintiffs.  This is rendered all the more obvious by the fact that Top Shelf has provided uncontradicted evidence that the initial paperwork they provided to plaintiffs related to safety and worksite issues.  See Ponticello Decl. ¶ 12.  Accordingly, this factor favors Top Shelf.

ii.    Control of Work Schedules and Conditions of Employment

The more supervision and control an entity exercises, the more likely it is an employer. See Zheng, 355 F.3d at 74-75.  But "the law does not require an employer 'to look over his workers' shoulders every day in order to exercise control."  Barfield, 537 F.3d at 147 (quoting Brock, 840 F.2d at 1060).  "[J]oint employer status may be found even where control is exercised only occasionally."  Vasto v. Credico (USA) LLC, 2017 WL 4877424, at *9 (S.D.N.Y.

Oct. 27, 2017) (internal quotation marks and citations omitted), aff'd, 767 F. App'x 54 (2d Cir. 2019) (summary order).

With respect to Top Shelf's control of plaintiffs' work schedules, at least one plaintiff was told on his first day by a Top Shelf employee that his working hours would be from 7 a.m. to 4 p.m.  See Gonzalez Decl. ¶¶ 5, 7.  Top Shelf supervisors occasionally asked some plaintiffs to stay late or authorized them to depart the worksites early.  See Herrera Decl. ¶ 14; Diaz Decl. ¶ 16.[3]  While these statements are inconsistent with Top Shelf's claim that PEI "independently determined its employee[s'] schedules and breaks," Ponticello Decl. ¶ 11, on summary judgment, we of course accept plaintiffs' version of events.  Notably, there is no evidence that Ibepaulino ever told plaintiffs what their hours were to be.  While the evidence on this issue is spotty, a jury could find that Top Shelf informed plaintiffs of their work schedules at the worksites and that the plaintiffs understood these hours to be the hours they were expected to work.

As to the issue of Top Shelf's control over plaintiffs' conditions of employment, Top Shelf characterizes its role as mere "quality control."  Def. Mem. at 20.  It is certainly true that "[c]ourts have widely held that exercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions."  Martin v. Sprint United Mgmt. Co., 273 F. Supp. 3d 404, 426 (S.D.N.Y. 2017) (citation and punctuation omitted).

But accepting plaintiffs' version of the facts, a jury could find that Top Shelf was not merely checking plaintiffs' work to ensure it was done properly but was instead involved in "day-to-day management" of the plaintiffs' work.  Id.  Verno assigned plaintiffs to work on

---

[3]  As discussed below, we do not view the "sign-in sheets" as indicative of joint employment.  See infra Section III.B.1.iv.

particular floors and stated which floors were priorities.  See L. Torres Decl. ¶ 9; Cruz Decl.

¶¶ 6, 8.  Top Shelf supervisors, including Verno, would provide specific instructions to plaintiffs,

meeting regularly with plaintiffs to answer questions and discuss their work.  See, e.g.,

Villagrasa Decl. ¶¶ 9-11; L. Torres Decl. ¶¶ 7-9; Cruz Decl. ¶ 8; Alayon Decl. ¶¶ 11-12.  Verno,

who was "on site almost every day," Alayon Decl. ¶ 6, met with Eduardo Cruz Gonzalez for at

least an hour per day, for example, Cruz Decl. ¶ 8.  Verno would resolve conflicting instructions.

See Alayon Decl. ¶ 13.  Ibepaulino did not identify himself or a PEI subordinate as the person to

be contacted regarding questions or issues at the Halletts Point site; instead, he identified Verno

as the person to whom such matters should be directed.  See L. Torres Decl. ¶ 4.  There is

virtually no evidence in the record from anyone with personal knowledge that Ibepaulino or any

supervisory personnel from PEI were on site giving instructions to plaintiffs as to how they

should perform their work or were otherwise supervising the plaintiffs' work.  Aside from the

evidence that Ibepaulino owned PEI, there is no evidence at all about PEI's management

structure.  None of the plaintiffs identify any PEI management as supervising their work.  And

there is no evidence that Ibepaulino informed Top Shelf that the plaintiff workers who

coordinated directly with Verno — Eduardo Cruz Gonzalez and Luis Torres — had the role of

PEI supervisors.  Nor does the record establish that, to the extent that these individuals can be

said to have overseen the work of other plaintiffs, they were placed in charge by Ibepaulino or

PEI.  Instead, the uncontradicted evidence is that only Verno and other Top Shelf employees had

any role in giving supervision to the plaintiffs.  Indeed, many plaintiffs state that they had

virtually no contact with Ibepaulino.  See, e.g., Briceno Decl. ¶ 16; Sanchez Decl. ¶ 12;

Declaration of Alirio Zavala, annexed as Ex. Q to Ward Decl. (Docket # 88-17) ("Zavala

Decl."), ¶ 13; Declaration of Sahagun Merejilodo, annexed as Ex. K to Ward Decl. (Docket # 88-11), ¶ 13.

Thus, the evidence provided by plaintiffs of day-to-day supervision by Top Shelf personnel goes far beyond the "quality control" identified in case law.  See, e.g., Martin, 273 F. Supp. 3d at 435 (second Carter factor not satisfied when defendant merely set and enforced compliance guidelines, held "atmosphere meetings, conducted audits, and intervened when certain 'high-level escalations' occurred with field agents").  Instead, it reflects a situation where Top Shelf ended up being "responsible for the day-to-day management of" PEI's employees. Vasto, 2017 WL 4877424, at *10 (citation omitted).

Top Shelf objects to the "self-serving, conclusory" nature of plaintiffs' sworn statements. Def. Reply at 5.  But the fact that the plaintiffs' sworn statements are "self-serving" — as is true of the statements provided by Top Shelf as well — is irrelevant.  See, e.g., Danzer v. Norden Sys., Inc., 151 F.3d 50, 57 (2d Cir. 1998) ("To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts — at an inappropriate stage — into an adjudication of the merits.").  And we disagree that the plaintiffs' statements on the issue of supervision are "conclusory."  Def. Reply at 5.  Plaintiffs have described particular supervisors, offered their basis for believing those individuals were in charge, and stated what types of directions, information, and assistance they received from these individuals.  See, e.g., Alayon Decl. ¶¶ 5-13; L. Torres Decl. ¶¶ 4-13; Villagrasa Decl. ¶¶ 9-12.  These are not "conclusory allegations" inadequate to withstand a motion for summary judgment.  Scotto, 143 F.3d at 114.

In its reply papers, Top Shelf submitted the affidavit of a "Director of Field Operations," who offers pronouncements about what PEI was supposed to do and what Top Shelf's "policy"

is on the role of subcontractors.  Scholes Decl. ¶¶ 1, 4-5.  Scholes ultimately does not contradict plaintiffs' evidence regarding the absence of PEI supervision at the jobsite.  He states that Ibepaulino was "typically at the job sites" only at the "beginning" of both projects, and then concedes that eventually Ibepaulino "completely stopped showing up."  Id. ¶ 6.  He vaguely refers to the existence of other PEI "supervisors" on site but does not identify any such individual, id., and thus a jury would be free to reject this evidence in favor of plaintiffs' statements that any supervision they got came exclusively from Top Shelf personnel.

Finally, Top Shelf is wrong that plaintiffs have failed to demonstrate that any of the particular supervisors that the plaintiffs identify were in fact employed by Top Shelf, see Def. Reply at 5 n.2, inasmuch as Top Shelf does not contest that Verno — whom the majority of these allegations relate to — was "a Top Shelf employee [present] at the Halletts Point Project on a regular basis," Def. 56.1 Counterstatement ¶ 64.

Thus, this factor favors the plaintiffs.

### iii.    Determination of Rate and Method of Payment

Plaintiffs admit that "there is no evidence that Top Shelf set the rates of pay of the [p]laintiffs."  Pl. Mem. at 21.  We agree with this undisputed characterization of the record.  This factor favors Top Shelf.

### iv.    Whether Defendants Maintained Employment Records

The final Carter factor considers whether defendants maintained employment records.  Such records "include an employee's personnel files, time sheets, pay stubs, and government employment forms."  Hugee v. SJC Grp., Inc., 2013 WL 4399226, at *7 (S.D.N.Y. Aug. 14, 2013).  In FLSA overtime cases, the "most relevant" records are those relating to "hours worked."  Barfield, 537 F.3d at 144; accord Hugee, 2013 WL 4399226, at *7.  Where the only

records at issue are created or maintained solely for "quality control purposes," this factor will not support a finding of joint employment.  See Hugee, 2013 WL 4399226, at *7 (citing Jean-Louis v. Met. Cable Comms., Inc., 838 F. Supp. 2d 111, 130 (S.D.N.Y. 2011)).

Plaintiffs identify several documents that they contend are employment records maintained by Top Shelf, which we refer to collectively as the "Personnel Records."  See Pl. Mem. at 21.[4]  Specifically, Plaintiffs offer two documents entitled "Pre-Shift Brief" with the Top Shelf logo on it, one document entitled "Sign In Sheets" with the Top Shelf logo, and one handwritten, Spanish-language document listing the hours worked by various plaintiffs between October 26 and November 2, 2018.  See Herrera Decl. Ex. 3 at *13-16.[5]  The "Pre-Shift Brief" documents and the "Sign In Sheets" document list the names, signatures, and — in two instances — the telephone numbers of various workers (some of whom are plaintiffs in this case).  See id. at *13-14, *16.  Two of these documents provide a date ("10/31" and "11/2," respectively) and include the notation, "7AM to 5PM."  Id. at *13, *16.

In its initial moving papers, Top Shelf argued that it possessed only "sign in sheets that were maintained by Top Shelf's safety director during weekly 'toolbox talks' and safety

---

[4]  These documents are annexed as exhibits to more than one of plaintiffs' declarations. We cite herein to the set annexed as Ex. 3 to Herrera Decl., at ECF pages *13-16.

[5]  Plaintiffs also cite to an additional timesheet, annexed as Exhibit 4 to the Zavala Declaration.  See Pl. Mem. at 21 (citing Timesheet, annexed as Ex. 4 to Zavala Decl., at *17 ("Timesheet")).  This document bears a heading that states: "PEI Electrical Service Group Sign In Sheet" and thus is obviously not a Top Shelf record, even if a Top Shelf employee had possession of it.  See Timesheet; Zavala Decl. ¶ 16.  If anything, this document suggests that it was PEI, rather than Top Shelf, that maintained plaintiffs' time records.  The fact that a subcontractor's timesheet was in the possession of its contractor does not allow the inference that the contractor actually took on the responsibility of maintaining the time record.  Additionally, Zavala's declaration represents that this timesheet was "signed" by plaintiffs, Zavala Decl. ¶ 16, however, the document itself has no signatures whatsoever, see Timesheet, casting substantial doubt on whether the annexed timesheet is in fact "[a] true and accurate copy" of the document Zavala represents it to be, Zavala Decl. ¶ 16.

meetings," which "Top Shelf was required to record . . . for compliance purposes."  Def. Mem. at 22-23 (citing Ponticello Decl. ¶ 15).  Plaintiffs have not offered sufficient evidence to counter this contention with respect to the three documents containing the Top Shelf logo.  As to two such documents, their title — "Pre-Shift Brief" — establishes that they are not the time records plaintiffs contend they are.  Neither these documents nor the "Sign In Sheets" document contain a line for each worker that would allow the entry of arrival and departure times on a given day — a characteristic of timesheets.[6]  Additionally, there is no evidence that these records were transmitted to PEI or otherwise used to calculate plaintiffs' pay.  Although plaintiffs assert that Top Shelf directed plaintiff Jamie Granada to collect plaintiffs' signatures on these documents, see Granada Decl. ¶ 16; Herrera Decl. ¶ 12; Morales Decl. ¶ 20, such a practice is consistent with Top Shelf's description of the documents' purpose.  Thus, plaintiffs have failed to raise a genuine dispute as to whether these documents are something other than what Top Shelf characterizes them to be.

The Spanish-language document, by contrast, appears to be a record of total hours worked, though not one contemporaneously made.  See Herrera Decl., Ex. 3 at *15.  It lists the total number of hours worked by various individual workers for each day (without arrival or departure times) over the course of a one-week period and provides a column totaling the hours for each employee.  See id.  The descriptions of the Personnel Records in the plaintiffs' declarations lump all the records together, including this document.  Morales and Herrera state that the Personnel Records were sheets for "us" to fill in "hours we worked as a group" but do

---

[6] Morales states that he filled in time sheets with the "date and time that we clocked in and out each day" and that he attached such sheets to his declaration.  Morales Decl. ¶ 20.  In fact, the attached sheets do not contain times for each plaintiff reflecting when they arrived and left.  See id. Ex. 4.

not explain anything further about the Spanish-language sheet in particular.  Morales Decl. ¶ 20;
Herrera Decl. ¶ 12.  Plaintiffs have not explained who at Top Shelf is alleged to have created and
maintained this document, how the various columns were filled in, and what was done with the
document.  There is also no explanation of why, unlike the other Top Shelf documents, it is in
Spanish rather than English.  More significantly, the only plaintiffs attaching this sheet state that
Granada was in charge of picking up and transmitting these documents.  See Morales Decl. ¶ 20;
Herrera Decl. ¶ 12.  But Granada's own declaration does not even attach the Spanish-language
timesheet, and instead attaches only the English-language sheets with Top Shelf's logo.  See
Granada Decl. ¶ 16; compare id. Ex. 1, with Herrera Decl., Ex. 3.  Granada, who is apparently
the only person with personal knowledge of the origin and destination of this document, does not
give any information about it at all.  In view of these foundational deficiencies, no reasonable
jury could conclude that this document was an employment record maintained by Top Shelf.

Finally, while it is not dispositive, the record contains testimony from an individual with
personal knowledge of the employment records maintained by Top Shelf, who avers that Top
Shelf does not possess any such records with respect to plaintiffs' work at the 86th Street and
Halletts Point Projects.  See Askew Decl. ¶ 5.

Thus, this factor favors Top Shelf.

*    *    *

To summarize, one of the factors favors a finding that Top Shelf was a joint employer
and three factors do not.  The Second Circuit has held that satisfying the four Carter factors "may
be sufficient to establish joint employment under the FLSA [but] it is not necessary to establish
joint employment."  Zheng, 355 F.3d at 79; accord Greenawalt, 642 F. App'x at 37 ("satisfying
[the formal control] test is sufficient, but not necessary, to show joint employment").  Therefore,

"[r]ather than determine . . . whether plaintiffs have supplied enough evidence to allow a jury to find formal control under Carter, we will instead turn to the Zheng 'functional control' test, which allows a more expansive determination of employer status.  In assessing 'functional control,' we will also consider any non-duplicative Carter factors in addition to the six Zheng factors."  Fernandez, 407 F. Supp. 3d at 456.

   2. Functional Control

  To determine whether plaintiffs can show "functional control" by Top Shelf, we turn to the six Zheng factors.

    i. Use of Premises/Equipment

 "[W]hether a putative joint employer's premises and equipment are used by its putative joint employees [] is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work."  Zheng, 355 F.3d at 72.  Zheng cautioned, however, that "shared premises . . . is [not] anything close to a perfect proxy for joint employment (because [it is] . . . perfectly consistent with a legitimate subcontracting relationship)."  Id.

  Plaintiffs' memorandum of law offers virtually no facts to support any argument that this factor applies other than to say that plaintiffs have raised "issues" regarding "their regular use of Top Shelf's premises and equipment."  Pl. Mem. at 22.  As to premises, plaintiffs do not analyze what it means to use Top Shelf's premises.  Here, the evidence is undisputed that the job sites did not belong to Top Shelf.  One court has questioned whether construction "worksites could be considered [defendants'] premises [in the absence of an] allegation that [defendants] owned the sites."  Yang v. An Ju Home, Inc., 2020 WL 3510683, at *5 (S.D.N.Y. June 29, 2020).  We agree that the phrase "putative joint employer's premises," as used in Zheng, 355 F.3d at 72, is

most logically read to require that the putative joint employer maintain at least some possessory interest in the premises at issue.  In this case, there is no evidence that Top Shelf maintained any possessory or ownership interest in either the 86th Street or Halletts Point worksites.  It thus cannot be said that either of the sites constituted Top Shelf's "premises."

As to equipment, there is some evidence that, in addition to supplying PPE, see, e.g., Ponticello Decl. ¶ 16, plaintiffs regularly collected materials necessary to complete their work — including cables and outlets — from Top Shelf's shanty or from a warehouse near the shanty. See Alayon Decl. ¶ 9; Gonzalez Decl. ¶ 14; Morales Decl. ¶ 13.

Although it cannot be said that the plaintiffs were using Top Shelf's "premises," the fact remains that the Top Shelf workers were also not using the Top Shelf premises.  However, given the fact that Top Shelf was supplying equipment beyond PPE, we view the first Zheng factor as essentially neutral.

ii.    Shifting as a Unit

The next functional control factor asks whether the PEI defendants "had a business that could or did shift as a unit from one putative joint employer to another."  Zheng, 355 F.3d at 72. This factor "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client."  Id.; accord Martin, 273 F. Supp. 3d at 430.  Thus, when a subcontractor (here, PEI) can shift its employees from one employer to another, this factor weighs against joint employment. See Greenawalt, 642 F. App'x at 38 (citing Zheng, 355 F.3d at 72).

Plaintiffs' memorandum in opposition conflates this factor with the fourth factor: that is, whether PEI's contract could pass to another subcontractor, see Pl. Mem. at 23-24, and thus its arguments are not on point.  This second Zheng factor does not favor plaintiffs, however.  In its

initial papers, Top Shelf has explained that there was nothing in the PEI contract that prevented PEI from shifting its workers to another employer.  See Def. Mem. at 25; see also Purchase Orders, annexed as Exs. 3-5 of Ponticello Decl. (Docket ## 83-3, 83-4, 83-5).  In their opposition and their sur-reply, plaintiffs offer no argument to the contrary.  We agree with Top Shelf that there is nothing in the record to suggest that PEI could not have shifted its employees from the Top Shelf worksites to separate, unrelated jobs.  And more to the point, there is no evidence that PEI existed exclusively to work on the two projects for which Top Shelf hired it.  Cf. Greenawalt, 542 F. App'x at 38 (factor met where subcontractor "existed only to serve" the putative employer and subcontractor was formed "in anticipation of" contract to service the putative employer).  Therefore, this factor favors Top Shelf.

iii.    Discrete Line-Job Integral to the Business

The third functional control factor examines "the extent to which plaintiffs performed a discrete line-job that was integral to [the purported joint employer's] process of production." Zheng, 355 F.3d at 72.  "Interpreted broadly, this factor could be said to be implicated in every subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service."  Id. at 73 (emphasis in original). Accordingly, this factor is examined on a spectrum:

> [o]n one end of the spectrum lies . . . piecework on a producer's premises that requires minimal training or equipment, and . . . [o]n the other end of the spectrum lies work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology.

Id.  Some "courts have questioned whether this factor translates well outside of the production line employment situation."  Godlewska v. HDA, 916 F. Supp. 2d 246, 263 (E.D.N.Y. 2013) (internal punctuation altered); see Jean-Louis, 838 F. Supp. 2d at 134 ("the third factor might

apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product").  Nonetheless, we will not ignore this factor given that it has been applied by courts, including the Second Circuit, outside the production line context. See, e.g., Greenawalt, 642 F. App'x at 39 (security guards); Vasto, 2017 WL 4877424, at *2-3, *14 ("field agents" soliciting applications for a benefit program).  In considering this factor, courts sometimes consult "industry custom and historical practice . . . because insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws."  Zheng, 355 F.3d at 73 (punctuation omitted) (further noting that if, "as a historical matter, a contracting device has developed in response to and as a means to avoid applicable labor laws, the prevalence of that device may . . . be attributable to widespread evasion of labor laws"); see also, e.g., Vasto, 2017 WL 4877424, at *14 (noting that the job at issue was "commonly outsourced.").

This factor presents a close call.  We accept Top Shelf's uncontested argument that subcontracting arrangements are ubiquitous in the construction industry.  See Def. Mem. at 26; Ovadia v. Off. of the Indus. Bd. of Appeals, 19 N.Y.3d 138, 144 (2012).  Yet the instant case is not a situation where a general contractor, lacking employees with specialized skills as to a particular task, hired a subcontractor to handle that task.  Rather, Top Shelf was itself a subcontractor brought on to do electrical work which elected to subcontract that work to PEI. See Ponticello Decl. ¶¶ 5-8.  Plaintiffs — responsible for the exact same electrical tasks as Top Shelf employees at the 86th Street and Halletts Point Projects, see Def. 56.1 Statement ¶ 34; Pl. 56.1 Statement ¶ 34 — therefore cannot be said to have possessed "specialized skills," Zheng, 355 F.3d at 73, that were beyond the capacity of Top Shelf's own employees.  Thus, we do not view the normal arms-length relationships between general contractors and subcontractors in the

construction industry as dispositive in this case.  There is no particular reason why Top Shelf had

to subcontract out the electrical work rather than give the work to its own employees, who were

doing the exact same work as plaintiffs at the same locations.  A reasonable jury could thus find

that this factor favors plaintiffs.

<blockquote>iv.    <u>Whether the PEI Defendants' Contract Could Pass to Another Subcontractor</u></blockquote>

The fourth <u>Zheng</u> factor asks whether "responsibility under the contracts could pass from

one subcontractor to another without material changes."  355 F.3d at 74.  As one case has noted,

"[t]he fourth factor asks not whether all of the putative joint employer's contractors do the same

work but whether, if the putative joint employer hired one contractor rather than another, 'the

<u>same</u> employees would continue to do the <u>same</u> work in the <u>same</u> place.'"  <u>Jean-Louis</u>, 838 F.

Supp. 2d at 135 (quoting <u>Zheng</u>, 355 F.3d at 74) (emphasis in original).  This factor also raises

the "subterfuge" issue because

> when employees are tied to an entity . . . rather than to an
> ostensible direct employer such as the [contractor] . . . . , it is
> difficult <u>not</u> to draw the inference that a subterfuge arrangement
> exists. Where, on the other hand, employees work for an entity (the
> purported joint employer) only to the extent that their direct
> employer is hired by that entity, this factor does not in any way
> support the determination that a joint employment relationship
> exists.

<u>Zheng</u>, 355 F.3d at 74 (emphasis in original).

Here, there is no evidence that Top Shelf operated in a manner that would have allowed it

to arrange for another subcontractor to take on the plaintiffs as employees if they left PEI's

employment.  Indeed, as Top Shelf points out, "when PEI was terminated after Top Shelf learned

that it was not paying its employees . . . , it is undisputed that the [p]laintiffs did not continue to

work at either location."  Def. Mem. at 27.  This factor thus favors Top Shelf.

v.    Degree of Control and Supervision

"The inquiry under this factor is largely the same as the inquiry under the second formal control factor and is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs." Martin, 273 F. Supp. 3d at 433 (citations, internal quotation marks, and alterations omitted).  As already discussed, this factor favors plaintiffs.

vi.    Exclusively or Predominantly Working for Top Shelf

The sixth Zheng factor asks whether the workers worked "exclusively or predominantly" for the putative joint employer.  355 F.3d at 72.  As Top Shelf recognizes, plaintiffs "claim to have spent all of their time working at the Halletts Point Project or 86th Street Project during the time at issue in this case," Def. Reply at 12, and plaintiffs have submitted evidence to this effect, see Diaz Decl. ¶ 2; Villagrasa Decl. ¶ 2; A. Torres Decl. ¶ 2; Herrera Decl. ¶ 2; Guerrero Decl. ¶ 2; Declaration of Gustavo Rangel, annexed as Ex. L to Ward Decl. (Docket # 88-12), ¶ 2; Sanchez Decl. ¶ 2.  Accordingly, the final factor favors plaintiffs.

3.    Summary

As the Second Circuit has stated, "the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, . . . determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." Barfield, 537 F.3d at 141 (citations and internal quotation marks omitted).  We must determine whether the "economic reality" was such that "the alleged employer possessed the power to control the workers in question." Herman, 172 F.3d at 139.

The issue before us is whether Top Shelf is entitled to summary judgment on this question — that is, whether we can conclude that no reasonable jury could find that Top Shelf was a joint employer of the plaintiffs.  "Because determining joint employment is 'fact-

intensive,' awards of summary judgment on this issue, although sometimes appropriate, are rare." Greenawalt, 642 F. App'x at 37.  As we have already discussed, among the six Zheng factors and the three non-duplicative Carter factors, a jury would be required to find that five entirely favored defendants — that is, whether Top Shelf possessed the power to hire and fire, whether Top Shelf determined plaintiffs' rate and method of payment, whether Top Shelf maintained plaintiffs' employment records, whether PEI could shift plaintiffs from one contractor to another, and whether PEI's contract could pass to another subcontractor.  In contrast, three factors — whether plaintiffs performed a discrete line job integral to Top Shelf's business, Top Shelf's degree of control and supervision over plaintiffs, and whether plaintiffs worked exclusively or predominately for Top Shelf — favor plaintiffs.  The remaining factor (relating to shared premises and equipment) is neutral.

Of course, the Court's task is not simply to tally the number of factors favoring each side but instead to determine whether a reasonable jury could find that Top Shelf "possessed the power to control the workers in question" such that it should be deemed an employer.  Herman, 172 F.3d at 139.

A critical consideration in the instant case is the fact that control and supervision of workers is the "[m]ost important[]" factor in this analysis.  Monzano-Moreno v. Fence, 2021 WL 688295, at *1 (E.D.N.Y. Feb. 23, 2021) (alterations in original); see also Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013) ("The critical inquiry in determining whether an employer-employee relationship exists [is] the degree of control exercised by the purported employer over the results produced or the means used to achieve the results.") (quoting Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198 (2003)).  And while it is a close question, we find the evidence as to this factor, in combination with the other factors favoring

plaintiffs, sufficient to deny Top Shelf summary judgment.  Indeed, Top Shelf does not assert

that summary judgment would be available if this Court were to find the control and supervision

factor met.  Top Shelf simply attacks the credibility of plaintiffs' evidence on this point, see Def.

Reply at 5 — attacks that we find unavailing.  In light of the fact that "the overarching concern is

whether the alleged employer possessed the power to control the workers in question," Herman,

173 F.3d at 139, we conclude that a reasonable jury could find that Top Shelf had such control.

While defendants argue that to hold them liable would be to find a contractor liable for the wage

violations of its subcontractor, the situation here was seemingly quite unusual in that a

reasonable jury could find that PEI provided literally no supervision over the plaintiff workers,

that Top Shelf was aware of this lacuna in supervision throughout the employment relationship,

and that Top Shelf stepped up to undertake the role of plaintiffs' supervisor, thus controlling the

plaintiffs' workday.

IV.     CONCLUSION

Because a jury could find that Top Shelf was plaintiffs' joint employer, defendants'

motion for summary judgment (Docket # 80) should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of

this Report and Recommendation to file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  A

party may respond to any objections within 14 days after being served.  Any objections and

responses shall be filed with the Clerk of the Court.  Any request for an extension of time to file

objections or responses must be directed to Judge Engelmayer.  If a party fails to file timely

objections, that party will not be permitted to raise any objections to this Report and

Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP

v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir.

2010).

Dated: June 28, 2022
       New York, New York

 

 

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge